MEMORANDUM OF DECISION
On May 20, 1997, the Department of Children and Families, hereafter "DCF" filed petitions for the termination of the parental rights of Barbara T. and Richard N. to their two children, Michael and Kimberly, now ages twelve and nine. The children have been in the care of DCF since June 7, 1992, when they were found unsupervised while their mother was intoxicated. They were adjudicated neglected and uncared-for children on April 12, 1993.
The court finds that both parents were served, have appeared and have court-appointed counsel. The court further finds that it has jurisdiction in this matter and there is no pending action affecting custody of these two children in any other court.
Barbara T. does not contest the termination of her rights. She consented to the termination of her rights to both children, after review of the matter with her counsel, and filed a written consent with the court. The court finds her consent to have been voluntarily and knowingly made with the advice and assistance of competent counsel and with a full understanding of the consequences of her act. Upon acceptance of her consent, the petition was amended to allege consent as the sole ground for the termination of her parental rights.
The allegations against the father are that these children have previously been adjudicated neglected and that he has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering CT Page 4611 the age and needs of the children, he could assume a responsible position in their lives. Connecticut General Statutes § 17a-112
(c)(3)(B). As to his son Michael, an additional ground of no ongoing parent-child relationship is alleged; that the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child does not exist and to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the child; General Statutes § 17a-112(c)(3)(D).
The court heard three days of testimony from six witnesses; the DCF case worker, the foster mother, Dr. Bruce Freedman, the court-appointed psychologist who evaluated the mother and the children, a social worker from Casey Family Services, Paul Barry, Michael's counselor at his residential placement, and Dr. Barbara Berkowitz, another evaluator of this family. The court received 25 exhibits into evidence including the social study and the reports of the evaluators. The court makes the following factual findings and the inferences reasonably supported by the evidence.
1. FACTS
The mother and the father have had a fifteen year relationship that has ended; a relationship that has been troubled due to alcohol use by the mother, suspected alcohol use by the father, allegations concerning domestic violence, issues about adequate income and housing and finally the neglect of the two children. Further, after several years in foster care, Michael made disclosures of sexual abuse, accusing his mother and father and older brother. The father denies these allegations. While DCF investigated the allegations, speaking to the child, the physicians and counselors who treated him and determined the allegations substantiated according to its guidelines, Michael's father claims the child lies chronically and was abused by a cousin, Jaime N.
The father also experienced neglect as a child, due to his mother's alcoholism, and he and his six siblings were placed in foster care after their parents' divorce. At the age of fourteen, he returned to the care of his father and stepmother. His connection to his father, whom he labels a difficult man, continues to the present day. He spent many years working in his father's businesses including, most recently, at a junkyard his father owned. He was in the military service during the Vietnam era, wounded and now receives a service-related disability CT Page 4612 pension. He has had two heart attacks while these proceedings were pending and since November of 1997, resides in Florida with his father. He is not a placement resource for the care of his two children, nor does he offer a plan for their care. Nonetheless, he maintains he is concerned about his children, loves them and does not believe the termination of his rights to them should occur.
But regardless of his undoubted sincere feelings, his actions belie his words. In 1992 and 1993, in an effort to reunify the parents with their two children, DCF provided intensive reunification services to make this possible. Casey Family Services came into the home to work with both the mother and the father. Part of the court ordered expectations were to follow their recommendations. Mr. N. was hostile, angry and combative. He did not believe any services were necessary and would not make a commitment to work toward reunification. In April of 1994, Casey Family Services again became involved to attempt to provide the parents with reunification services, based on the parents' statements that they were willing to work with the agency. Despite their assertions, however, the parents were not cooperative, were unable to plan for visits with the children, and complete all of the required tasks for reunification. Once again, they were discharged from the program.
Other expectations had been set for both parents. For Mr. N., one requirement was to have a substance abuse evaluation because of allegations concerning his drinking. It remains unclear whether an evaluation was performed by the Veteran's hospital. In any event, no information was ever provided to DCF about such an assessment and whether or not Mr. N. needed further treatment. Another expectation was no further involvement with the criminal justice system. In 1994, he was arrested and convicted on burglary charges, although there have been no arrests since that time. The crucial expectations, however, related to individual and family counseling as well as parenting education. These were never met by Mr. N.
During the time of the intense reunification efforts, the family was psychologically evaluated by Dr. Barbara Berkowitz. Her findings then were prophetic of the situation today, some five years later:
 "It is clear that Richard N. loves his children very much, to the best of his ability. CT Page 4613 `Unfortunately, because of his own emotionally impoverished background and difficulties resolving feelings about his service in Vietnam, there may be some impairment in his parenting capabilities. The major concern this psychologist has is whether or not he can be assisted in providing a reasonable, appropriate, stable plan for the children's care and development."
Dr. Berkowitz recommended that he attend individual therapy, a step he has not taken in all these years. In a re-evaluation a year later in April of 1994, she found that he still placed blame for the family problems on DCF, therapists at the Casey program and on the mother's inability to stop drinking. He did not understand the educational problems his son was experiencing and had no understanding of the child's probable learning disabilities. He had not attended any individual counseling, remaining evasive about his willingness to do so. At that time, Dr. Berkowitz also recommended family counseling. As with the individual counseling, such counseling never took place. She found that Mr. N. had a positive relationship with his children and was able to relate to them appropriately and lovingly. In her last addendum, prepared on July 21, 1994 after review of the children's and parents' behavior in other settings, Dr. Berkowitz wrote:
 "it appears that Mr. N.'s personality and health difficulties have increased in the past few months. His temper has flared and his behavior has been inappropriate during several meetings. He has continued to vehemently and adamantly deny his own difficulties with aggression and substance abuse and to refuse to become involved in any sort of treatment . . . In addition, he has reportedly denied the extent of the children's psychological difficulties, seeming to consider Michael's attempt to hang or strangle his little sister with a rope a typical little boy behavior. Neither parent seems able to recognize the full extent of the children's psychological or psycho educational problems, which are significant. It is highly unlikely that the parents could sufficiently meet the children's needs in those areas, now or in the relatively near future."
At that time, Dr. Berkowitz wrote about the children's sexualized behavior, stating; CT Page 4614
 "Their mutual and individual sexualized behavior must be strongly and appropriately addressed, by parental figures and professionals who understand and can caringly deal with such behavior. Neither of their birth parents is likely to be able to do so and both of them seem to think the problem has disappeared."
At the conclusion of her report, Dr. Berkowitz recommended long term foster care and supervised visitation with the children.
Initially, Mr. N. was consistent with visitation with his children. In 1994, Michael's behavior in the foster home escalated and in addition to aggressive and overly sexualized behaviors, he began to set fires. By early 1995, he was hospitalized at the Institute of Living and then at the Newington Children's Hospital from March of 1995 to June of 1995. It was during his stay at Newington that Michael made disclosures concerning sexual abuse by his mother, father and older brother. Upon his discharge, Michael was placed at a residential facility for boys and based on the information his counselors there received, contact with his parents was terminated.
Even this painful rupture of contact with his son, however, did not motivate change on Mr. N.'s part. He did not attend counseling or deal with the allegations except to claim Michael lied. Nor did he take any steps to reverse the loss of the right to see this child. As the present DCF caseworker testified, she has only seen Mr. N. in court; he has never called or inquired about the children or asked what he could do to have access to his son in her several years on the case. The court concludes that he has never looked inward to question his own actions and consider what changes he could make in himself to regain his children.
Mr. N. has had more contact with his daughter, Kimberly, than with Michael. He visited Kimberly for the last time on June 30, 1997. But even with such supervised contact, his commitment to the child has waned. From his conduct, the court concludes that he has given up on her as well as on his son. In the fall of 1997, he left to move with his father to Florida and has had no contact with Kimberly, either in person or by telephone since that time. He has sent no cards, gifts or letters.
As parents all over the world know, parenting children requires effort, sacrifice, regular soul-searching and dedicated CT Page 4615 commitment placing the children first, ahead of one's own needs. There is no doubt that it is a tall order in the best of times. For individuals such as Mr. N., who have experienced breaks and deficits in their own parenting, it is an even more difficult task. But simply saying that he loves his children without more, when many people were available to help him do more, falls woefully short of the mark necessary to demonstrate that he has rehabilitated himself to the point where within the reasonably foreseeable future he could be expected to care for his children. There has been no evidence of such rehabilitation; there has been the reverse, a consistent and blatant disregard of any steps required of him for rehabilitation and the court so concludes from the clear and convincing evidence before it. By the date of the filing of the termination petitions on May 20, 1997, Mr. N.'s lack of rehabilitation has existed for years, established by clear and convincing evidence.
A. MICHAEL N.
Michael is now twelve and one-half years old. He has been in foster care since he was seven. Both he and Kimberly spent the first several months after their removal from their parents in the care of a paternal aunt. That placement ended in September of 1992 when DCF discovered the aunt was not following DCF directions regarding visitation of the children with their parents. Both children continued to act out in ways that the home could not handle. In particular, the aunt's husband appeared unwilling to have the children in his home. Both were then placed together in a specialized foster home through the Village for Children and Families, the home in which Kimberly still remains.
The extent of Michael's difficulties became obvious during the months after his removal from his family in 1992. In September he was psychiatrically hospitalized at St. Raphael's hospital, having threatened himself and others and exhibiting suicidal behavior. When he came into the foster home, his foster mother testified that he exhibited extremely aggressive behaviors, hitting one child with a bat and threatening another boy with a hammer in the first weeks of his placement. He had no concern for his own safety, doing things such as jumping from trees at about a ten foot height. He also exhibited sexualized behaviors, particularly toward his sister, Kimberly. He remained in the home for over two years and during this time was identified as a special education student. CT Page 4616
Michael was evaluated, along with his other family members in 1992 and 1994 by Dr. Berkowitz. In 1992, through projections, as he was very guarded, Dr. Berkowitz found certain themes to be evident.
 "Parents cannot be relied upon for nurturance and caretaking. The children in a family must fend for themselves as best they can. Some danger is sensed in adult males (perhaps harkening back to having been molested by an older adolescent cousin). The sense of danger is strongest at night. . . . Michael also exhibits some sexual preoccupation and may handle his sexual anxiety through acting out what was done to him. His younger sister, who depends upon him, seems the most likely target for such acting out."
The accuracy of those themes in his life as they played out in Michael's life cannot be denied. Michael did act out against his sister, his foster mother reported. By 1994, Dr. Berkowitz found that "Michael remains an angry, manipulative little boy, who is very attached to his mother." She found that he was in need of individual therapy and that "he had many issues common to older children (parentification) of dysfunctional parents with substance abuse problems and chronic disabilities." The foster mother also testified to his continuing problems. By 1995, however, when Michael began to set fires, three that she knew of, it was time to seek a more structured setting for him, as she could not safely care for him any longer. In the spring of that year, Michael was placed at the Institute of Living and then hospitalized at Newington Children's Hospital. As previously noted, it was at Newington Children's Hospital that he disclosed that he and Kimberly had been sexually abused by their mother, father and oldest brother.
Since June of 1995, Michael has been in a residential home for boys where he is under observation twenty-four hours a day. The first year was difficult for Michael as he continued to act out. He required physical restraint on at least fifty separate occasions, his counselor, Paul Barry testified. By the end of that year, however, Michael began to commit to the process of learning how to keep himself safe and to cope with his own symptoms. The frequency and severity of his symptoms decreased and he is slowly recovering.
While in residential placement, Michael has been diagnosed as Attention Deficit Hyperactivity Disorder, Post Traumatic Stress CT Page 4617 Disorder and Disassociative Disorder not otherwise specified. He has been placed on various prescription regimens to calm his behaviors. He is currently receiving medication for his conditions. He continues to engage in the actions noted by the foster mother, but far less frequently than before. The reports from the school note continued sexualized behavior, aggression with others, denial of his behavior when confronted with it, regression to the behavior and voice of a younger child and trance-like staring episodes. Even in this setting where he is supervised twenty-four hours a day, he is a "challenging youth", his counselor found. Mr. Barry stated that Michael still has "intense episodes for reasons that are often not clear. He is oppositional with staff, has tied shoe laces and electrical wires around his neck and threatened to hurt himself and used a piece of glass to threaten staff." Then he settles down and is tearful. These episodes have become less frequent and Michael is actively engaged in learning techniques to deal with these emotional states. In this placement, he has never disclosed sexual abuse nor has his counselor confronted him or questioned him about it. His behaviors, however, his counselor testified, are consistent with a child who has experienced physical sexual abuse. Mr. Barry also stated that Michael was not, in his opinion, adoptable, given his age, condition and symptoms. Mr. Barry stated that Michael had no connection to his father and had never spoken about him positively. Even over time, however, he has retained some sense of connection to his mother. The child knows, however, that he cannot return to live with his parents nor does he wish to do so. He knows that his mother could not keep him safe. Mr. Barry believed that termination was in Michael's best interests to provide him with permanency and stability.
Michael was evaluated in September and November of 1997 by Dr. Bruce Freedman. His conclusions coincide with those of Michael's therapist. Based on the treatment and care he has received while in placement, Dr. Freedman believes this child has a reasonable prognosis for a healthy and productive life. He also shared the belief that a termination of his parents' rights to him was in Michael's best interest as his need for security and permanency was strong. He did acknowledge that adoption was unlikely and that he required a highly structured setting to control his behaviors.
B. KIMBERLY N.
During her testimony, Kimberly's foster mother described her CT Page 4618 foster daughter as having sexualized behaviors, being manipulative and frequently lying to avoid punishment. However, since her placement in 1992, Kimberly has made progress. She acts out in sexualized behaviors less frequently, her temper tantrums are gone and she is a nice little girl most of the time. She testified that Kimberly fits in well with her family and adopted son. She is attached to her foster mother and father and some of their grandchildren. Her foster mother is committed to raising this child to adulthood, but is unable to adopt her due to financial reasons.
Kimberly, like her brother, expresses no interest in her father, but has had contact with her mother to the present time. She wants to continue limited contact with her mother. Upon viewing her with her mother, Dr. Freedman found in late 1997 "her interaction today showed the limited closeness, limited maternal competency but tolerance of mother which would sustain a relationship with this child." He testified that Kimberly has come to regard her foster parents as her parents and wants to remain with them until she grows up. He recommended a termination of her parents right to her as in her best interests, as it would provide her with a sense of security and permanency. A termination would also permit her foster parents to feel secure and invest in her more psychologically, knowing that she would not be removed from their care.
ADJUDICATION
The mother, Barbara T., has consented to the termination of her parental rights to her son and daughter, Michael and Kimberly N. With respect to the statutory grounds for termination of parental rights, the court finds, as previously stated, by clear and convincing evidence, that Richard N. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, he could assume a responsible position in their lives. Connecticut General Statutes § 17a-112(c)(3)(B). As of the date of the filing of the termination petition on May 20, 1997, he was not ready to resume their care and had made no plan for them. He had not rehabilitated to any extent. Further, the children had been adjudicated neglected on April 12, 1993, almost five years ago. The court also finds that this ground had existed for significantly longer than one year at the time of the filing of the petitions.
The allegations concerning the lack of an ongoing relationship CT Page 4619 with Michael N. are more troublesome to the court. The court concludes that Richard N. had a reasonable relationship with Michael, as found by the court-appointed evaluator, Dr. Berkowitz, as of 1994. She also testified that Michael's relationship with his father was warm. She found that Michael seemed to respect his father and to enjoy spending time with him, although there were problems with Mr. N.'s parenting. From the evidence, the court concludes that, whatever the relationship may have been, it has faded since Michael's placement in a residential group home.
Richard N. argues that it is fundamentally unfair to terminate a parent's rights to his child for the lack of a relationship where the parent is prevented from maintaining a relationship by DCF's own actions, citing In re Valerie D., 223 Conn. 492,613 A.2d 748 (1992). That case stands for the proposition that where a child is removed on an order of temporary custody from its parent at birth, that termination of parental rights is not then appropriately based upon the lack of a parent-child relationship some three and one-half months later, where DCF itself has prevented the formation of the relationship. In that case, the court construed the two applicable statutory provisions to prohibit such a result.
There are some significant differences in the case before this court. Michael was not a new-born child when removed from his family. For over two years, his father had supervised visitation with his son. Because the father had not regularly lived with the family, the psychologist found Michael's connection to his father tenuous in 1994. She stated:
 "Mr. N. is not a central figure in the family. They are attached to him and enjoy him when he is there, but do not seem to connect with him as a permanent part of their home life."
By 1997, two years after contact had been ended, Dr. Freedman found that to the extent the child retained any memories of his father, those memories were negative. He also testified that some children are able to sustain a relationship with their parents even under such circumstances. Dr. Freedman stated that such connection is based on the individual child, positive memories of the past and the bond that had been established earlier. He stated that it was abundantly obvious that this was not the case for Michael.
The case law also holds that the determination of whether or not there is an ongoing relationship is viewed from the optic of CT Page 4620 the child. "It is reasonable to read the language of `no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been displaced. In either case, the ultimate question is whether the child has no present memories or feelings for the parent." In re Juvenile Appeal (Anonymous),177 Conn. 648, 670, 420 A.2d 875 (1979). See also In re JuvenileAppeal (Anonymous), 181 Conn. 638, 646, 436 A.2d 290 (1980).
The court concludes, based on the clear and convincing evidence, that there is no ongoing parent-child relationship between Michael and Richard N. This case is not analogous to the facts in In re Valerie D., supra, and the reasoning set forth therein does not apply. While the evidence has established that their relationship once did exist, it has now ended. Those memories that Michael does retain of his father are negative ones. Further, Richard N. never provided the day-to-day care of this child or nurtured him. He is not now able to do so. Giving him more time to do so when he has taken no steps to make it likely that he could is detrimental to Michael and not in his best interests.
Also raised is the issue of whether or not Michael's contact with his father was appropriately terminated, based on the conclusion that the sexual abuse allegations Michael made against his family were accurate. Richard N. also called into question whether or not more efforts should have been made to forensically investigate those allegations. While Richard N. maintains that such an investigation should have been undertaken, Paul Barry, Michael's therapist, found it was not in Michael's best interests to subject him to the stress of such an investigation. The court is not now in a position to second-guess the dedicated clinicians involved in this decision, nor would such action be appropriate. Neither does the court conclude that the sexual abuse allegations made by the child have been proven and conversely that they have also not been disproved. Any conclusion about the veracity of Michael's accusations does not obviate Richard N.'s failure to take all steps to regain access to this child and to rehabilitate himself. There can be no doubt that he failed to do so, based on the overwhelming evidence. He has, as a result of this failure, no ongoing relationship with Michael. The court further finds from the clear and convincing evidence, that the failure of the relationship to his son had existed for more than one year when CT Page 4621 the termination petition for Michael was filed.
REQUIRED FINDINGS
The court will make no findings regarding Barbara T., the biological mother of the children as same are not required due to her consent to the termination of her parental rights. The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e) concerning Richard N.:
1) Timeliness, nature and extent of services offered and made available to the parent and the children in order to facilitate the reunion of the children with the parent; DCF offered intensive reunification services to Mr. N., from which he was both unwilling and unable to benefit to reunify with his children. Other services, as recommended, were declined by him;
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds in this proceeding that the father was unwilling to benefit from reunification efforts. The attempt to reunify the family through the use of Casey Family Services with service providers going to the home to assist the parents were made not only once, but twice in the hopes that the family would take advantage of those services, which they did not do. Upon the recommendation of Judge McWeeny at a court hearing, reunification efforts ceased in 1994. A court order that reunification efforts were no longer appropriate was made in 1997. All parties, however, conducted themselves in accordance with the recommendation and there was nothing to suggest, in view of the intensive efforts made, further efforts would have been accepted by Mr. N;
3) The terms of an applicable court order entered into and agreed upon by any individual agency and the parent and the extent to which all parties have fulfilled their obligations under such order; The court has previously reviewed the reasonable court expectations set for the father and his failure to comply with them in important respects. He did not address his counseling needs and the issues that prevented him from being able to parent his children. He refused such counseling and was hostile to all intervention efforts;
4) Finding as to the feelings and emotional ties of the children with respect to the parents and foster parents: Kimberly CT Page 4622 has strong emotional ties with the foster family who has provided the physical, emotional and educational support this child needs and requires for more than half of her life. They are committed to caring for her until she becomes an adult, although they are unable to adopt her. Michael is close to his counselor at his residential placement, as well as to other staff there. He is going to be thirteen years old in May and is not likely to be adopted, given his specialized needs and the structured setting his care requires. Kimberly retains some ties to her mother, but more as a visitor than as a parent. Michael, too, recalls his mother but has expressed no recent interest in seeing her. Neither child has positive emotional ties to their biological father;
5) Finding regarding the age of the children. Michael is twelve years and eleven months old and Kimberly is nine years and five months old;
6) Finding regarding efforts of the father to adjust his circumstances, conduct or conditions to make it in the best interests of the children to return them to his home in the foreseeable future and (A) the extent to which the father has maintained contact with the children as part of an effort to reunite the children with the father, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As has previously been found, the father's contact with both of his children has ended. Based on his behavior, his unwillingness to participate in services and make any changes for the children's sake and their own negative memories of him, the court finds by clear and convincing evidence that it is not in their best interests to return them to his home in the near future and he is not a resource for them;
7) Finding regarding the prevention of the father from having a meaningful relationship etc. Until the psychiatric hospitalization of Michael in 1995, DCF took many steps to foster a relationship between Michael and his father. It has continued to make visitation possible with Kimberly. The court has found the conduct in terminating visitation with Michael not unreasonable under the circumstances of the condition of the child and his disclosures. No unreasonable conduct is noted.
DISPOSITION
CT Page 4623
Michael continues in his residential placement and at present there are no plans to move him, although his counselor spoke of the possibility of return to a specialized foster home with significant structure for Michael at some time in the future. Kimberly is in a foster home where she wants to remain. Both children are slowly recovering and the maladaptive and self-injurious behaviors which they exhibited when removed from their family of origin are less frequent. They are both doing well in school with the special supports that have been provided to deal with their specialized needs. Psychological experts have testified that each of the children needs the permanency, stability and consistency provided by their present placements, even though eventual adoption is not likely. Based upon the clear and convincing evidence and the foregoing findings, the court determines that it is in Michael and Kimberly N.'s best interests that a termination of parental rights enter with respect to their mother, Barbara T. and their father, Richard N. These findings are made after considering these children's sense of time and their need for a secure and permanent environment. The court therefore hereby ORDERS that the parental rights of Barbara T. and Richard N. are terminated. It is further ordered that the Department is appointed the statutory parent of Michael and Kimberly. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report regarding permanency plans for the children and file further reports as are required by state and federal law.
Barbara M. Quinn, Judge Child Protection Session